Good morning, Benjamin Rosenblum from Jones Day on behalf of the appellants to the E.R.S. bondholders. May I reserve five minutes for rebuttal? I'll give you three. Thank you, Aaron. The Oversight Board stripped E.R.S. of all of its assets and revenues for the benefit of the Commonwealth of Puerto Rico and the Commonwealth of Puerto Rico's creditors. Is it the question whether the district court abused its discretion in denying your motion? Could you get to that? Yes, ma'am. The district court abused its discretion when we sought a relief before the district court under 926 to undo these transfers as unauthorized and fraudulent. The district court deferred to the discretion of the Oversight Board and their determination that the transfers benefited the Commonwealth of Puerto Rico and the Commonwealth of Puerto Rico's creditors. Can I just stop you? What are the errors of law that you are alleging, if any, in this abuse of discretion review which we must undertake? Could you listen for me just sequentially? Your Honor, we believe that the district court abused its discretion when it considered an inappropriate factor, which was the Commonwealth of Puerto Rico and the Commonwealth of Puerto Rico's creditors' interest in analyzing the 926. Why construct for me, please, the argument that that was an error of law? Yes, Your Honor. We believe that under Chapter 9 precedent and the PROMESA statute, it's inappropriate to consider another debtor's interest in passing on 926 relief. Specifically, in the Chapter 9 context, the cases are clear that a state may not prefer itself financially. We cite the Fifth Circuit case, the Mission Independent School District case, which had to do with Texas legislation purporting to favor state bondholders over private bondholders, and the Stockton case, which had to do with California's pension legislation attempting to prefer CalPERS, the state of California, over other creditors. We also cite Section 106 of the Bankruptcy Code incorporated into PROMESA, which abrogates the Commonwealth's sovereign immunity with respect to 549 and 926 sections. Specifically, Congress contemplated a situation where a Title III debtor sued the Commonwealth of Puerto Rico under 549. The district court's test forecloses that result by looking at the benefit of the transferee. If you put 926 and 549 and 106 together, Congress expressly contemplates a post-petition transfer, which means it happens on the oversight board's It expressly contemplates and indeed requires 926 relief that the oversight board refused to bring that cause of action. And then it abrogates the Commonwealth's sovereign immunity with respect to that cause of action. It means Congress envisioned a scenario where a Title III debtor would be suing the Commonwealth under that scenario. The district court's test, this holistic test, which is nothing more than looking at the benefit of the Commonwealth, effectively erases those provisions. Because I will stipulate, when you transfer ERS's wealth to the Commonwealth and the Commonwealth's creditors, the Commonwealth and the Commonwealth's creditors benefit. But that can't be the test. Can I ask you a practical question? It seems that one of our decisions two months ago held that ERS, if I understand it correctly, that ERS and the interest ERS had in additional future revenues that are not already received were not a property, were not property of ERS. That's correct, Your Honor. So that wipes out the 549 claim as respect to that amount of money. Let me make clear what we're talking about. The decision of this court a few months ago Before you do that, answer the question. Does that wipe out your 549 claim? No, Your Honor. It does not wipe out the 549 claim. In terms of the property that is at issue, the court's decision reached post-petition revenues received after the filing. What we're that it acquired thereafter. So specifically, we're talking about accrued and unpaid receivables, something that this court in footnote 12 of that decision recognized the bondholders had a lien on. Second, to the extent that the Commonwealth, sorry, the ERS received money as post-petition, that would be property of ERS even if they were not subject to our lien. Third, the system's investment assets. I'm talking about what property? Is this a hypothetical assumption on your part? No, Your Honor. I'm referring to the system's investment assets, the system's equipment, the physical building, everything that the ERS had prior to the filing date. The statutory text provides that all of the ERS's assets, and that includes anything that it was holding, all of the system assets that were there on the petition date, are transferred to the Commonwealth's general fund. So everything, the decision cuts off revenues going forward. ERS had $2 billion worth of assets when it commenced Title III. We're talking about those assets. I understand the $190 million, and I understand maybe some photocopiers and other stuff, but how do you get at the amounts that had not yet been paid by the employers? You have to say that's property of ERS. Your Honor, I have to say that the amounts not paid by the employers prior to Act 106, because I think it's different. It's one thing to say that the ERS didn't have a property right on the filing date versus ERS didn't have a property right at some later point in time. And it's not just copiers and $190 million, it's $2 billion in investment assets. Once again, you're evading the question. Are you, in fact, asserting contrary to the opinion we just issued about 40 days ago, that you have a right in this lawsuit to post-petition contribution from employers? Yes or no? Yes, I do. Yes? Yes. I am asserting that I have a right to post-petition contributions of employers received after the petition date, which I believe the court's decision held we did not have a lien on, but did not suggest that ERS, once those amounts were received, didn't become property of ERS. Let me go back to my question. It wasn't just a holding you didn't have a lien on. It was a holding that they were not property of ERS. As of the filing date. And if they're not property of ERS, then how can 549 apply to it? If they were received after the filing date. It was the money turned into money in hand. Right. Okay, but how much money was actually received in hand? I thought it was $190 million in cash that was transferred. No, Your Honor. We contest the extent of the transfer. We believe it's $2 billion of assets including private equity assets, bonds of other government issuers, $700 million worth of accounts receivables for additional uniform contributions. This is a little frustrating because your reply brief mentioned none of this. Your Honor, our reply brief didn't even, if I read it correctly, I might have missed it. Your reply brief paid no attention to our January decision. Your Honor, our reply brief refers to investment assets of this system and accrued receivables. Well, let me ask you this. Certainly the red brief touted, as you would expect, the January decision. And you couldn't have addressed it in your blue brief because it didn't come down. So I turned anxiously to the gray brief to see, well, how are you going to deal with that decision? And best I could tell you, abandon it because it looked like you had nothing to say about it. Now you're saying today that some of that, what is it, $2.6 billion is left untouched by that decision and we're supposed to parse this out on oral argument without the benefit of any briefing? It puts us in a very difficult position. Your Honor, let me try to clarify a little bit. There's admittedly $2 billion of assets sitting at the system when the Title III case was made. When you say assets, you're including amounts receivable. Yes, Your Honor. Accrued and unpaid. And you're assuming those are property. Yes, and I believe they are under the footnote 12 of that First Circuit decision. So you're not saying there's just so many $2 billion in assets. You're claiming there are $2 billion in property that was transferred, even under the definition of property in our January decision. Yes, Your Honor. Okay. You may be getting a little greedy here. Can we turn back to the $195 million and what your arguments are as to that? Sure. Trust change. But that's basically what I had understood this lawsuit was about. Your Honor, I will turn to that. So going back to the district court's focus on the commonwealth and the commonwealth of Puerto Rico's creditors, PROMESA contains numerous provisions respecting the separateness of the Title III debtors. Section 304 of PROMESA prohibits the substantive consolidation of the debtors. Section 407 of PROMESA, which regulates inter-debtor transfers, will say it's not. Okay. As I understand your argument, even though it is perfectly clear that there is an abuse of discretion standard that we are to use and that Congress did not specify the factors which must be considered by the district court in this situation, that you think PROMESA itself precludes the consideration of the fact that this is a proceeding involving the government. Isn't that what your argument boils down to? Yes. I believe it is inappropriate for the district court to consider the commonwealth's financial interest in passing on the 926 bill. Okay. And are you going to explain... The 190 million I don't think was affected by our decision in January, so it seems to remain alive. They've put forward three arguments about why even on the... Actually, four arguments if you count the first one, about why you don't get the 190 million even though that is property. Are you going to share with us today your views about what's wrong with those arguments that they're making? With respect to the colorability of the claims? Yes, on the 190 million. Sure. I'll turn to the merits of those claims. So we allege a 549 claim. You have to prove three elements in connection with a 549 claim. One, that there is a transfer of property. Two, that transfer occurred post Title III. And three, that the transfer was unauthorized. With respect to the first, there's no dispute at least with respect to the 190 million that a transfer occurred. We obviously allege that it was a bigger transfer than that. With respect to the post petition, everybody agrees that the events, whatever happened here, occurred. I don't think any of those points are contested as I understand their argument. They're saying that 303 and 305 provide in permissive proceedings a protection of the government's property that insulates them from what would otherwise be a straightforward 549 claim. That's correct, Your Honor. So what's wrong with that argument? So on Section 303, two things. One, Section 303, the first part of it, is merely declarative. And it doesn't mean it's surplusage. Because of the way Congress set up Chapter 9, that basically in the Beacon's decision, the court determined that there was a compact between the state and the federal government. So 903 in that context, coupled with the government's consent, formed a compact between the state and the federal government. So we don't believe that the lead-in to 903 has any substantive or interpretive import. And we cite the city of Vallejo case for that proposition. What about their argument? They have another argument. Sure, the $190 million went. But what came back was an assumption of the liabilities that ERS had. And they assumed more than $190 million in liabilities. So net-net, ERS was just in as good a position. And that could be taken into consideration by the judge in deciding the discretionary issue of appointing a trustee. Your Honor, under this court's decision a few months ago, with even 78-1G, the court interpreted the Commonwealth's appropriations as already being responsible for the employer contributions. And further, under the ERS Enabling Act, once an employer is delinquent and is withdrawn from the system, ERS has no further responsibility for those pensions. So to answer Your Honor's question, ERS received nothing in exchange for the transfer of its assets. The Commonwealth is paying the pensions, but it's receiving the revenue streams that ERS would otherwise have received. And the Commonwealth was on the hook for the pensions, and ERS was not. So we submit that there's no consideration flowing to ERS for the $190 million or anything else. And then their last argument, as I understand it, is 363 is missing in PROMESA. So we should draw an inference against you on that. That's right. Their view is 363 is missing, so everything is authorized under PROMESA. We don't think that's right. We think that the application of the automatic stay, which applies to all entities, including government entities, prohibits the exercise of control over the ERS's property. And we don't believe that anything in Section 303 or 305 eviscerates the automatic stay. They also make a contention that under 362b-4 that there's an exception for an action or proceeding by the government under its police or regulatory power. This is not an action or proceeding. It's a piece of legislation. The Albion case cited in our paper stands for the proposition that 362b-4 just doesn't apply by its terms and also for the reasons in our brief of why we don't believe this is a political or governmental power. It's certainly not a police or regulatory power under this Court's precedent, which interprets that provision as narrow. Before you sit down, you have a number of litigations going, including the Altair litigations, and I believe they're mentioned in the District Court opinion as providing you with the remedy that you seek here. I understand you have a different theory of liability here, but isn't it true that if you win either the Federal Court of Claims action or the Altair action, you have effectively achieved the remedy you want here? Yes, Your Honor, those claims have different proofs, and in fact, we have sort of stated... My question is remedy, not theory of liability. Yes, Your Honor. Okay. But if you lose those, that doesn't mean you'd still be an unsecured creditor, so you'd still have an interest in an ERS recovery. That's right, Your Honor. Now, my friends take a different position, but that is correct, and I just would like to point out, if I may, that in those other cases, they argue we don't have standing, so it's sort of a catch-22. When we assert that they violated the automatic stay, they say that's a 549 claim. When we seek to bring the 549 claim, they say you can't bring that because you're seeking other remedies. They're tough choices for counsel. Thank you. Thank you. Good morning. May it please the Court, my name is Martin Beanstock, attorney from Proskauer Rose LLP for the Financial Oversight Board for Puerto Rico. I'd first like to clarify the key facts and the discussion that just occurred about the unsecured claim, because the way we parse it, it's much simpler, I think, than appellants. Their proposed complaint that they want a trustee to bring has two counts, and both of them asked for two batches of assets, and they're the same two batches. What we've referred to somewhat as the $190 million, plus maybe the stapler gun or whatever, and then the future employer contributions that the legislation terminated. They contend that they have an interest in reinstating those employer contributions, because even though this Court ruled about 40 days ago that their lien would not attach to those employer contributions, they're an unsecured claim holder against the IRS, and they have an interest to that extent. That is categorically, totally, 100% wrong for the following reason. Number one, they admit that they are a non-recourse creditor, and the Court only has to look at the bond resolution that's in the appendix, pages 144 and I think 207, and section 201 of the resolution says non-recourse bonds. Then they go to section 1111B of the Bankruptcy Code, and in their reply brief they say, hey look, section 1111B, it says that even if you're a non-recourse creditor, you get an unsecured claim as if you were recourse. What they do not do, and this is the critical point, is go to section 1111B1A2, and B1A2 says that if the collateral is sold under the plan, or under 363, but that doesn't apply here, so if the collateral is sold under the plan, then they do not get the recourse unsecured claim. We have never filed a proposed plan that does not sell the collateral. ERS is now an empty financial shell with remnants. The only thing to do is to sell the collateral, there's nothing else there. It has no purpose, it doesn't provide health service, teaching, police, it has to be sold. They will never have an unsecured claim against ERS, and that is why, even if they successfully prosecuted a lawsuit, reinstating the employer contributions, as this court ruled, their lien would not attach, and they would not have an unsecured claim against ERS for what goes into ERS. So we're only left with the assets that we've been talking about, the $190.5 million, which today I heard for the first time, they're talking $2 billion or whatever, they'll have to explain it at some point. But we conceded below, and we conceded on appeal, that if they had a lien on the petition date against the $190.5 million, and they put in the record the deposition of Mr. Collazo of ERS, who said, yes, the Commonwealth told us to sell the assets, and we got $190.5 million, and we transferred it, and it's being held in escrow, we have said, if that lien is valid, they get the benefit of that value. Now, they've come back on appeal, and they've said, well, not so fast, because we mentioned that if the lien detached under Unifor commercial code section 9-332B, well, then they wouldn't get it. And I'm authorized to say that even though that would be valid, the oversight board, and your honors can hear from Afaf, all agree that we're not going to use 332B to take away their lien by our having transferred or by ERS's having transferred the $190 million from ERS to a Commonwealth account. If the lien was valid, that value is theirs. Now, they may owe it back to ERS, because they got adequate protection payments previously on the assumption they had a lien that they ended up not really having, but that's not part of this appeal. The $190 million will be to their credit if their lien was valid on the petition date. And what about the standing issue that counsel mentioned in the other action? I'm not sure I'm following on that. Sure. Counsel just mentioned, Mr. Rosenblum just mentioned that you're raising the defense of a lack of standing in the other proceeding, if I heard it correctly. Yeah, well, all I can say is regardless of what we're saying in the other proceeding, they don't have to bring a proceeding for us to give them $190.5 million if their lien was valid. We would do that under the plan. So, it's not going to take away the $190.5 million that we've said they get if their lien was valid on the petition date, regardless of that other proceeding. So, distilling it down, your argument, if they have a valid lien, they're secure, they're going to get the $190 million. If they don't, they're unsecured, and in this proceeding under 332B1, whatever it is, they wouldn't recover anything at all, anyhow. Right, and we're saying we're not using the 332B for that purpose, but I'm also... It's under 111. We don't, for the reasons I mentioned, they're not going to have an unsecured claim. They don't have one now, and they're not going to have one at the time of confirmation. And that's because of 111B1A2. That's right. Now, as to the standard, it's clear from Judge Swain's decision that Judge Swain looked at the corporate cases that appellants raised in the context of derivative standing, but also looked at other things, and, in fact, says in her decision, in her Honor's decision, that there are other interests at stake. This is a government, and in the holistic approach, the judge did, I think, what this Court would want her to do, is look at all facts and circumstances. And I'd like to provide an analogy. In the corporate world, it's certainly the case in many cases, not all, that corporate subsidiaries of a holding company are in a rough-and-tumble situation, sometimes with different creditors, and they fight with one another and see who gets the most, and maximizing the estate is their game, and, you know, it goes to the winner. We analogize the Commonwealth and its instrumentalities not as the rough-and-tumble corporate world, but as the human body. The two arms can't fight for all the energy in the body at the expense of the heart stopping to beat. That is the problem that is in Judge Swain's lap. That sounds a little bit like substantive consolidation into one body. Well, we're not saying that we're combining the assets and liabilities of the entities to create a substantive consolidation. But if you take all the assets and liabilities out of one entity and put it in the other, isn't that the same as substantive consolidation, in effect? And I'm saying we're not doing that. I'm simply saying that... Well, you have done it with ERS, haven't you? Haven't you taken all of their assets and liabilities and transferred them to the Commonwealth? No, I'm saying the $190 million that they had to lean on we're not going to take away from them, as long as they're leaning on it. But the transaction purported to give that to the Commonwealth, doesn't it? The Commonwealth passed legislation that did that, and as Your Honor mentioned in the prior argument, there are four reasons, and counsel for the Retiree Committee will likely go into them, but you've already mentioned them. There are four reasons why that transfer may well hold up against a fraudulent transfer attack. Because, yes, the Commonwealth did assume liability of ERS in exchange for getting the assets. Our rationale, though, for volunteering the $190 million to them is that if they did have a lean, a valid lean, and they had come in for adequate protection, it would have been protected for them. You say it would hold up to a fraudulent transfer, which would be a 544, but what about 549? You don't need fraud, do you, to have a 549 challenge to a transfer post-petition. You've got the automatic static. Right, well, but even if it were under 549, the fact that the assets were transferred in exchange for an assumption of liability and that 363 doesn't apply does show it could clearly be determined to be an authorized transfer. I mean, we're simply saying that we know if they had come in for adequate protection of their lean on the assets, they probably would have been granted it. We would have had to safeguard to them somehow the $190 million. Absent use of the police power to show that under the extreme financial distress, and that's a case we could have made, but we're just not making it here. I mean, we're giving them something. They say it's not enough, and suddenly there's $2 billion, but that's not a battle that the Financial Oversight Board decided to take. This question of holistic view versus conflict that might exist, is that issue front and center in any other adversarial complaint or other proceeding that we might not be aware of from reading this case? Your Honor, it's likely going to be raised because there are, for instance, there are stay-relief motions pending that will be argued. They're currently scheduled to be argued on April 2 or April 3 where creditors of different instrumentalities, the Infrastructure Fund, HTA Highways, the CCDA, the Convention Center, count on getting money from the Commonwealth, and it's likely that the argument Your Honor just mentioned of the Financial Oversight Board being on both sides, whether it's a Title III debtor or even not, because we do the fiscal plan and budget for all the covered entities, it's likely that issue will come up. Okay, thank you. May it please the Court. Katherine Stege on behalf of the Retiree Committee. I'd like to start with Judge Lynch's first question, which was whether the District Court abused its discretion in denying the 926 motion, and it didn't for the simple reason that Your Honor's questions brought out, which is that the claims have no merit. The common ground here I think amongst all the briefs is that if you don't have meritorious proposed claims, then the Board could not have abused its discretion in refusing to bring them, and the claims here are not with merit. This Court's January 30 decision put the nail in the coffin of the claim to avoid the statutes themselves. If ERS didn't have a property interest in those statutes, there couldn't be any transfer of property, something that's required to bring either a 548 or 549 claim. Ms. Stege, this may be too simple-minded an approach, but our question is abuse of discretion, okay? And let's assume that our prior opinion eliminated a good portion of the original claims, and we're still left with the 190.5-plus copiers. Do we really have to decide that on the merits they have no claim in order to decide that there was no abuse of discretion in not appointing trustees? This is a very complicated set of cases in front of us, and there is, at least in the mind of one judge, a need to write narrowly, all right? So do you have arguments that would be consistent with taking a narrow approach to the question of abuse of discretion? Yes, Your Honor. All right. And in particular, Judge Swain, who did have the entire case in front of her, not just ERS but all of the cases, looked at these claims, and she concluded that they had potentially strong defenses to them even before this Court had issued its 552 decision. And no one has suggested, I mean, the bondholders say she really didn't look at the claims, but she clearly did, and everyone argued before her all the reasons why those claims were suspect. I don't think the standard here is if the claim has any minute chance of passing a motion to dismiss, it must be allowed to proceed. So saying that the trial judge could have, without abusing discretion, looked at an initial view of the potential strength of defenses without us getting into the ultimate resolution of those defenses would be adequate? Yes, Your Honor. And I would say there's an additional reason here why Judge Swain didn't abuse her discretion, which goes to the statements that Mr. Bean and Stock just made that the Commonwealth and the Board made below, which is a practical matter. They're going to put the $190.5 million back into the ERS estate if the bondholders in the litigation below dealing with tracing of their liens show that they have a lien. They've now said they'll put it back even if they don't trace with regard to a lien. So there's no reason to bring the lawsuit. I think the one thing everybody could agree on in these cases is these Title III cases don't need more litigation. They need less litigation. And the judge sitting there hearing that whatever this transfer was will come back in said, I don't need to appoint a trustee to do what they're willing to do. To appoint a trustee... Were those representations made to her? Yes, they were, Your Honor. They were made in the briefs. We noted that representation. The Board, all parties noted that in their objections to the motion. And the court understood. And that was part of the argument that that money would come back. And so in a way, the Board and the Commonwealth have agreed to do more for the bondholders than they would have got if they got a trustee. If they got a trustee, presumably the Commonwealth and the Board would defend against any lawsuit that was brought. And there is a chance that they would have prevailed. In your answer to Judge Lynch's question, I'm aware of authority that says that if the judge finds the claims are not colorable, the judge can certainly rely on that in not appointing a trustee. There was no finding here by Judge Swain that the claims weren't colorable. She found that there were, quote-unquote, strong defenses to them. That seems to cross the boundary from a sort of is it a colorable claim or not to a sort of back-of-the-envelope adjudication of the merits of a colorable claim. Is there any precedent that you would point us to that that can be a consideration in the weighing process on whether to appoint a trustee to pursue a claim? You know, the cases that we cite in our briefs, Sabine Oil and there are some others, that talk about when claims are futile, when they lack merit, the courts. All that sounds non-colorable. Right, but that's in a corporate setting. Here we're in a governmental setting where there are more concerns than just maximizing value of the estate. Maybe in a corporate setting you say to yourself, okay, if somebody has a claim that might pass over the line, we'll let it go forward and we'll see how it plays out. But here you're talking about a situation where half the claims admittedly by this court's decision are gone. The major claim they want to pursue, which is avoiding the statute itself, something no court has ever done, avoided a statute as a fraudulent transfer of the like. And the $190 million, the board has agreed to give it back and to avoid making any arguments in defense to that. So you don't need a lawsuit. You don't need a trustee to do something a party has already agreed to do. The one other thing I would say is that I think there's a misconception in this argument from the bondholders about the $2 billion and all the rest of it. There is property in ERS. Not all of the assets were transferred over. $190 million was transferred over, but there are other things that are there. That's what the parties are talking about and trying to determine who has lien rights on them in the lien tracing litigation. So it is not a situation where all of ERS's assets were taken and moved over to the Commonwealth. And as to Your Honor's point with regard to 549, remember ERS makes this transfer pursuant to a statute. Under Puerto Rico law, you don't get to say I won't comply with a statute because I don't think it's valid or I think it can be avoided. ERS did this pursuant to a statute that was enacted by the legislature that required the transfer of the assets. And even notwithstanding all of that, the Commonwealth is willing to send the money back if the bondholders are entitled to receive it. Thank you. Good morning, Your Honor. Peter Friedman from Melvin and Myers on behalf of AFOP. Judge Kayada, I want to directly address the question you asked. Is there relevant precedent? The answer is yes. NYC Off-Track Betting Court, 2011 Westlaw 309594, we cite it on page 20. Judge Glenn, who is an esteemed Southern District of New York bankruptcy judge, looked at 305, looked at Appointment of 926, and among the reasons that he declined to appoint a trustee, taking into account the entire framework of Chapter 9, were that the debtor made the payments not because of political pressures or a desire for future good relationships with a particular creditor, but because the payments were mandated by state law. The debtor is no longer operational and therefore does not aspire to maintain or build strong ties to its creditors. Therefore, irrespective of the colorability of the claims, Judge Glenn ruled that it was appropriate for the debtor, off-track betting, to decline to appoint a trustee and he was not going to override that. So I think that there is specific precedent that addresses the point you raised. Judge Lynch, I wanted to address an issue that you mentioned, which is are the bondholders proceeding on different theories? The answer is actually they're proceeding on the same theory, and Judge Swain knew that too. The bondholders have filed proofs of claim against the Commonwealth. In paragraph 43 of their Commonwealth claims, they assert fraudulent transfer in their own name. Now, I don't think that's a codable claim, but they are actually asserting the exact same theories in their individual capacity. And one of the problems with appointing a trustee here is AFAF and the ERS and the Commonwealth are defending those claims. If you permit the appointment of a trustee, what you will be allowing is for the bondholders to step into the shoes of ERS and simultaneously put ERS in a position of defending those claims and having somebody prosecute those claims in his name. With deference to all of you, perhaps too much of Puerto Rico's money has been spent on counsel. What is your response to the non-consolidation provisions? So I think the answer is that this is not substantive consolidation. Substantive consolidation is an equitable doctrine. This is the kind of legislation that has to be protected by 303. And I note that 303 is not simply a declaration of intent. It wouldn't make sense to have specific exceptions in 303 if it was just a, hey, this is a nice idea. It has to have meaning. Otherwise, why would Congress have specifically carved out three specific areas where 303 doesn't apply? That's in addition to Titles I and II, which carve into the Commonwealth's political powers. But it wouldn't make sense to have specifically enumerated exceptions, mind you, none of which the bondholders attempt to fit themselves into. And there's a very powerful exclusio unius argument that given that they don't fall within any of the exceptions to 303, their lawsuit can't be brought here. Spell out for me whether there is any limit to these cumulative arguments that you're making in any municipal bankruptcy. Are you effectively saying that the state here at Puerto Rico, that the state could effectively just take all the assets of the municipality, subject perhaps to the single exception of if an asset is subject to a security interest? I think, first of all, 303 That seems to be the logical direction you're taking us in. I think the answer is no. The answer is because 303 only says there are bankruptcy code limitations. It doesn't take away somebody's takings claim, if they have one. It doesn't take away somebody's other rights. 303 is extraordinarily powerful in that it prevents the state from dealing with fraudulent transfer claims. The taking claim in that instance would be the municipalities. And if what you're saying is that the municipality couldn't bring a claim... The municipality can't bring a bankruptcy claim. It may have a different kind of claim. Individual creditors may have different kinds of claims. Here the bondholders have filed a gazillion lawsuits. The only one they can't bring is one that seeks to use the powers of the bankruptcy code against the state to interfere with the state-municipality relationship. And this is very different from Stockton and the other relevant cases. There the state was saying, don't apply a section of the bankruptcy code to me. Here it is PROMESA that says the section doesn't apply. It's the language of 303. Are you saying the creditors would have a takings claim against the Commonwealth for the Commonwealth having taken property from the creditor's debtor? If the creditors can establish under applicable non-bankruptcy law that they have that right, yes. I don't think 303 is the bar to that. There may be other bars, but 303 doesn't bar that, Your Honor. May I address one issue in Section 549? Are they making such a claim before the Federal Court of Claims? They are, and they're also making it in the District Court against Puerto Rico. May I address 549 for one second, because I think that there is an important issue. Section 549 is not a debt letter, and I will give you a very specific example why, even though we are all correct that it can't form the basis of a claim here, it has meaning. Judge Lynch, you mentioned there are a lot of professionals. Professionals get paid pursuant to court order. There is a permitted interference with the debtor's property under 305 because the Oversight Board consented to have professional fees regulated. If the Commonwealth pays my fees and ignores that in the court's order, if it makes a payment that is inconsistent with the court's order, that would be an unauthorized transaction against 549. 549 has meaning because under 305 the Board can consent to interference with its property. When it does and the government ignores court orders, that's when 549 kicks in, so I think it can be perfectly harmonized with the absence of 305 and 363. Thank you, Your Honors. Your Honors, with respect to the property transfer, we heard from Ms. Stieke that there are other assets at ERS. To the extent assets were transferred, we're seeking to recover them. To the extent they remain at ERS, we're not. They haven't been transferred. With respect to Mr. Bienenstock's point, and I would agree with Judge Lynch that it's not appropriate to reach the recourse issues on this appeal. They're addressed in summary on page 19 of our reply brief, but we assert substantial in personam claims against ERS. We also assert that under 1111 of the code that our claims are recourse. We don't believe a sham sale pursuant to a plan frustrates 1111's conversion of our otherwise nonrecourse claims under the bonds themselves to recourse, but I don't think that that's an appropriate issue for today. Your client ran the risk of getting merits-based rulings against it on all of these claims by bringing this action. Understood, Your Honor. Judicial restraint may be another matter, but you knowingly incurred these risks. Your Honor, I would refer you to 19 of our briefs where our proofs of claim reference substantial in personam claims not pursuant to the bonds, but pursuant to the bond resolution and tort law and other federal and constitutional provisions. There's no basis for those claims to be treated as recourse. They're not subject to the recourse limitation in the bond resolution. In terms of the substance of consolidation issue, we heard from Mr. Bienenstock that they're acknowledging this governmental shell game. They're purporting to transfer all of ERS's assets and liabilities to be part of a commonwealth. That is not what he said. Would you like to move on? Your Honor, we submit that the transfers that occurred here were unauthorized and fraudulent. We're seeking a 926 trustee so that we can pursue that before a neutral tribunal someday. We believe that the merits of these claims should be heard, and that's the only way that you'll get an arm's-length adversarial result out of these Title III cases. And we believe that's appropriate. That's all we're asking for rather than deference to the board. On the recourse issue, isn't it before us because you're arguing your counterargument to their argument that you'll be able to get the 190 if you're secured? As I understand it, it's been yes, but if we lose that claim that we're secured, we'd be an unsecured creditor with recourse. And their counter to that is no, you wouldn't under 1111. So how do we avoid deciding that? Well, Your Honor, you could decide it by determining that the district court didn't bring its discretion and that it was appropriate for the district court to take into account the client's discretion. Well, of course you'd like to win, but you have some risk of losing. Given that risk, you were asked a question of is there a way for this court to avoid resolving that recourse question. Yes, Your Honor. You could affirm the district court's view. You wouldn't want to avoid that. You could affirm the district court's decision based on the district court's reasoning. Mr. Jones, we would go back to Judge Lynch's very first point, which is the issue is did the bankruptcy court abuse its discretion? And to decide that it didn't abuse its discretion, we wouldn't necessarily have to weigh in the full nine yards on all of these issues. That's correct. Okay. Thank you. Thank you all. All rise, please.